REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 493

September Term, 2016

_____

WHITE PINE INSURANCE COMPANY

v.

HOWARD R. TAYLOR

_____

Woodward, C.J.,
Berger,
Arthur,

JJ.

_____

Opinion by Berger, J.
Concurring Opinion by Arthur, J.

_____

Filed: July 27, 2017

This appeal arises from appellant-defendant, White Pine Insurance Company's ("White Pine"), denial of coverage to its insured, West End Pub and Restaurant, LLC ("West End" or "West End Pub"), for a shooting injury suffered by one of West End's patrons, plaintiff-appellee, Howard R. Taylor ("Taylor"). The injury occurred on March 31, 2013, as Taylor opened the door of the pub and was shot in the leg. No suspect was apprehended and Taylor did not see who fired the gun. After West End's insurer, White Pine, denied West End's request to provide a defense to Taylor's claim for negligence, West End and Taylor reached a consent judgment agreement (the "Consent Verdict"), in which West End admitted negligence and agreed to a settlement of $100,000.00. Further, West End assigned to Taylor its claims against White Pine for denying indemnity coverage under its commercial general liability policy ("the Policy").

Thereafter, Taylor filed an action for breach of contract against White Pine seeking judgment in the amount of $74,999.99 in the Circuit Court for Washington County. After a bench trial, during which neither side presented any evidence of the circumstances leading to the shooting (other than the Consent Verdict), the circuit court found in favor of Taylor and awarded damages in the amount of $100,000.00.

White Pine presents three issues on appeal, which we have reworded as follows:

1. Whether the circuit court erred by finding that White Pine presented insufficient evidence that Taylor's injury was excluded from coverage under the Policy's Assault and Battery Exclusion, and therefore, that White Pine had a duty to indemnify West End Pub for its liability to Taylor.

2. Whether the circuit court erred when it did not find that White Pine had established that the Consent Verdict

between West End Pub and Taylor, in which West End Pub admitted liability for negligence, was unreasonable.

3. Whether the circuit court properly awarded damages in the amount of $100,000.00, which exceeded the $74,999.99 amount of the *ad damnum* clause of Taylor's complaint.

## BACKGROUND AND PROCEDURAL HISTORY

### *Factual Circumstances*

On the night of March 31, 2013, Taylor visited the West End Pub in Hagerstown, Maryland, not far from his apartment to watch a basketball game. Taylor began to leave the pub at approximately 1:43 a.m. As Taylor opened the door to exit, however, he was struck by a bullet in his left leg. The police did not apprehend the shooter or determine his or her identity, and the shooter's motivation for firing the gun remains unknown. Taylor testified that he did not observe anyone brandishing a gun while he was inside West End Pub, nor had he been warned that he was about to be shot. Taylor further testified that he had not heard of any prior shootings at the Pub, and he did not see who shot him or where the bullet was fired. In addition, Taylor testified that approximately ten people were standing nearby when he was shot, two of whom were employees of the pub. No other evidence regarding the circumstances of the shooting was entered into evidence.

### *Commercial General Liability Framework*

On the first page of the "Commercial General Liability Coverage Form," the Policy begins by noting that "[v]arious provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered." Under "Section I -- Coverages," the Policy provides that the insurer

2

will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [The insurer] will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

. . .

This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured . . . and no "employee" authorized by [the named insured] to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred in whole or in part.

Under Section IV – "Commercial General Liability Conditions," regarding third-party

actions against the insurer, the Policy provides the following:

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

Finally, Section V -- "Definitions" -- defines several terms used in the Policy.

"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

3

. . .

"Occurrence" means *an accident*, including continuous or repeated exposure to substantially the same general harmful conditions.

. . .

"Suit" means a civil proceeding in which damages because of "bodily injury" . . . to which this insurance applies are alleged.

(Emphasis added).

The "Assault, Battery, or Assault and Battery Exclusion" ("Assault and Battery Exclusion") is an endorsement, which is attached to the Policy. The Assault and Battery Exclusion provides that the insurance policy

> does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of or resulting from:
>
> 1. "Assault", "Battery", or "Assault and Battery" committed by any person;
>
> 2. The failure to suppress or prevent "Assault", "Battery", or "Assault and Battery" committed by any person;
>
> 3. The failure to provide an environment safe from "Assault", "Battery", or "Assault and Battery";
>
> 4. The failure to warn of the dangers of the environment which could contribute to "Assault", "Battery", or "Assault and Battery";
>
> 5. "Assault", "Battery", or "Assault and Battery" arising out of the negligent hiring, supervision, or training of any person;
>
> 6. The use of any force to protect persons or property whether or not the "bodily injury" or "property damage" or "personal and advertising injury" was

4

intended from the standpoint of the insured or committed by or at the direction of the insured.

The Policy provides definitions for "Assault", "Battery", and "Assault and Battery." An "assault" is defined as (a) "an act creating an apprehension in another of immediate harmful or offensive contact," or (b) "an attempt to commit a 'Battery.'" A "battery" is "an act which brings about harmful or offensive contact to another or anything connected to another." According to the Policy, an "Assault and Battery" occurs when both are committed together.

### *Procedural History*

Following his injury, Taylor sued West End Pub alleging negligence in the Circuit Court for Washington County. West End requested a defense and indemnification from White Pine and White Pine denied the request, asserting that the shooting incident was not covered under the Policy. West End and Taylor agreed to settle and the circuit court entered a Consent Verdict in the amount of $100,000.00 for medical expenses and noneconomic damages. Under the terms of the Consent Verdict, West End assigned to Taylor all of its rights, interests, claims, actions, and suits, including extra contractual and punitive damage claims against West End's insurer, White Pine, for breach of the Policy.

Thereafter, Taylor made a demand on White Pine for payment, including medical payment benefits, which White Pine denied for the same reasons that it denied West End a defense and indemnification. Taylor filed his Complaint against White Pine for breach of contract on March 12, 2015, and White Pine filed a counterclaim for declaratory relief. On or around June 4, 2015, White Pine moved for summary judgment, which the circuit court

5

denied. Both parties presented oral arguments during open court proceedings on March 10, 2016. White Pine moved for judgment at the close of Taylor's case and renewed the motion at the close of all evidence. The court denied both motions.

During the proceedings, Taylor's counsel argued that Taylor's injury was covered under the insurance policy, and White Pine argued that the Assault and Battery Exclusion removed the incident from coverage under the Policy. Taylor's counsel argued that White Pine failed to show that Taylor's injury was the result of an "assault" or a "battery." White Pine argued, and continues to argue on appeal, that the fact that Taylor was shot by a gun is enough to show that the incident constituted a battery, as there is no intent requirement under the Policy's definition of "battery." In ruling on White Pine's motion for judgment, the trial court explained:

> I have to admit that as I was listening to the testimony, the -- the brief testimony of Mr. Taylor, it did occur to me that I don't know what happened. I know he was, based on this testimony, he was shot. That doesn't seem to be in dispute here. But how -- how that happened, I -- I don't know. And I think it's very easy to have a knee-jerk reaction and say, "Well clearly it's an assault and battery. If a person's shot, it's an assault and battery." But that's not necessarily -- that's not necessarily the case . . . . [I]f I don't know what happened, then I don't -- I can't say that it's an assault and battery. And if I can't say it's an assault and battery, then I can't apply . . . the exclusion in that contract. So at this time, the Motion is denied.

In its defense, White Pine presented one witness -- Lauren O'Shea -- a Senior Claims Analyst with Conifer Holdings, Inc., of which White Pine Insurance Company is a subsidiary. Through O'Shea's testimony, White Pine offered into evidence the process through which White Pine had reviewed and denied Taylor's requests and claims.

6

After the presentation of O'Shea's testimony, White Pine rested its defense and renewed its motion. Counsel for White Pine focused exclusively on the language of the Policy's Assault and Battery Exclusion. She argued that the exclusion requires that the act be "committed by any person." She continued, "If you cut yourself on a glass, that's an accident. But if some person engages in an act which brings about a harmful or offensive contact, that wouldn't be covered." The court explained, however, "I don't have any evidence that another person did that . . . . I think there's . . . a leap happening here that someone . . . shot him." The court responded, "Can a gun discharge accidentally? Yes . . . . [C]an a bullet go through the air not intentionally?" Counsel for White Pine attempted to reconcile the difference between an "accident" under the Policy and a "battery" in the following way:

> Sure it can . . . . But it's done by a person and it's an act which brings about a harmful and offensive contact. We don't need to show for the analysis of this policy that somebody intended to shoot, somebody intended to discharge their gun . . . . [A]s it's defined in this policy, it's whether a person commits an act which brings about a harmful or offensive result. So yes, if it were an accidental discharge of a gun by a person, yes, I would submit that we would still be here saying that this exclusion applies.

Finally, the court asked, "[I]sn't it the same scenario as the waitress handing me a broken glass? It's an act done by another person accidentally that causes me harm." Counsel for White Pine responded, "I guess . . . suppose for . . . argument's sake, perhaps I would be here arguing under that factual scenario that . . . in that particular situation, this endorsement would apply."

7

On May 4, 2016, the circuit court entered judgment in favor of Taylor in the amount of $100,000.00, the full amount of the Consent Verdict, and denied White Pine's request for declaratory relief. White Pine filed a timely appeal. Additional facts are discussed herein as they become relevant.

## DISCUSSION

### I. Standard of Review

Pursuant to Maryland Rule 8-131(c), "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous . . . ." To the extent this case involves questions of law, including the interpretation of a contract, we review for legal error. *See Clickner v. Magothy River Ass'n*, 424 Md. 253, 266-67 (2012) (quoting *Dickerson v. Longoria*, 414 Md. 419, 432 (2010)) ("Where a case involves both issues of fact and questions of law, this Court will apply the appropriate standard to each issue."). "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law . . . ." *Spacesaver Systems, Inc. v. Adam*, 440 Md. 1, 8 (2014) (citing *Towson Univ. v. Conte*, 384 Md. 68, 78 (2004)).

### II. The Circuit Court Did Not Err by Finding that White Pine Did Not Meet Its Burden to Show that the Assault and Battery Exclusion Applied to Preclude Coverage for Taylor's Injuries.

The critical issue in this case is whether the circuit court erred by finding that White Pine failed to establish that Taylor's injuries were excluded from coverage as a "battery" as defined in the Policy's Assault and Battery Exclusion. Our focus, therefore, is on the evidence presented at trial and the interpretation and applicability of the Policy's definition

8

of "battery." The only evidence presented regarding Taylor's injuries at West End, however, established only that a bullet hit him in the leg as he opened the door to leave the pub and that he did not know who shot him or from where the bullet was fired. Neither side presented any evidence to the trial court tending to show that the shooting was intentional rather than "accidental." In other words, the trial court had no evidence before it regarding whether or not the shooter intended to harm another person, to put another person in apprehension of harm, or to set a force in motion that ultimately led to Taylor's shooting injury.

Nevertheless, on appeal, White Pine frames the trial court's ultimate determination in the following way:

> The trial court based its ruling on the illogical and specious assertion that the evidence did not provide "information . . . as to how the injury occurred," presumably because the assailant's identity and location were unknown, notwithstanding the incontrovertible agreement that Taylor was shot by a gun. The court then followed that fallacy with the concern that it could not "leap to the conclusion" that the shooting of a bystander was "an assault, battery, or assault and battery simply because it is a gunshot." Put quite simply, if shooting someone isn't a battery, it is hard to say what is.

Despite White Pine's simplistic characterization of the result it seeks in this case, the combination of two specific facts distinguishes this case from other cases addressed previously in our case law. First, the Policy's definition of "battery" in the Assault and Battery Exclusion, at least ostensibly, does not require any particular state of mind. Other cases, decided on different grounds, have involved policies that do not define assault and battery, but leave the determination of whether an assault or battery occurred to be decided

9

in an underlying tort case or related criminal prosecution. *See, e.g.*, *7416 Baltimore Ave. Corp. v. Penn-Am. Ins. Co.*, 83 Md. App. 692, 695, 698 (1990) (concluding that, where an exclusion in the Policy excludes "claims arising out of Assault and Battery," the issue must "be resolved in the tort action.").

Second, the shooter in this case was not identified or apprehended. Indeed, there is no evidence in the record that any person, including Taylor, witnessed any person shoot Taylor or of any other circumstance leading to the shooting. Whereas in other cases, the evidence presented tended to indicate the shooter's intent to commit a battery or assault -- such as evidence of an altercation preceding the injury[1] -- the absence of this kind of evidence raises the issue of whether the intent of the shooter must be established to distinguish the injury from one that simply arises out of an "accident."

White Pine alternates between two varying positions in arguing that evidence of the cause of or intent behind the shooting is immaterial. On one hand, when White Pine confronts the issue of whether it must establish the intent of the shooter, White Pine argues that we should rely principally on the Policy's definition of the term "battery," which White Pine asserts requires no evidence of the shooter's state of mind. Nevertheless, without any state of mind requirement, the Policy's definition of a "battery" blurs the line between a covered bodily injury as a result of an "accident" and an excluded bodily injury that

---

[1] *See, e.g.*, *First Financial Ins. Co. v. GLM, Inc.*, 88 F. Supp. 2d 425 (D. Md. 2000) (injured party was stabbed by another patron in an adult entertainment facility); *Kamaki Skiathos, Inc. v. Essex Ins. Co.*, 396 F. Supp. 2d 624 (D. Md. 2005) (injured parties claimed they were forcibly removed, thrown into the street, and punched by bouncers and employees of the bar); *7416 Baltimore Ave. Corp.*, *supra*, 83 Md. App. 692 (injured party claimed he was assaulted when he was forcibly ejected by bouncers).

10

conceivably arose out of "an act which brings about harmful or offensive contact to another" -- the policy's definition of a "battery." Alternatively, when White Pine is faced with the ambiguity raised by the Policy's definition of "battery" in the context of the Policy as a whole, White Pine argues that the Policy's definition is consistent with a commonsense understanding of the definition of a battery[2] within criminal and civil common law contexts. As explained *below*, however, definitions of battery under both criminal and civil law require that the person committing the battery intend to commit some particular act or possess some other culpable state of mind.

The rather unique facts of this case raise the question of whether the Policy's Assault and Battery Exclusion can, properly, exclude from coverage bodily injuries and property damage arising out of *any* "harmful or offensive contact of another." Put differently, either the Policy's exclusion bars from coverage all bodily injuries and property damage that arise out of "an act which brings about harmful or offensive contact to another" (and it is therefore inconsistent with common law definitions of battery), or White Pine was required to show more than the mere fact that Taylor was shot in order to establish that his injury fell within the exclusion. Indeed, not even White Pine's counsel -- albeit understandably -- could reconcile the assertion that virtually all bodily injuries caused by another person are barred from coverage with the Policy's overall purpose of providing

---

[2] The simplistic view advocated by White Pine is summarized by its argument that "[i]f shooting someone isn't a battery, it is hard to say what is."

11

general commercial liability insurance for bodily injuries and property damage arising out of "accidents."[3]

For the reasons discussed herein, we hold that the circuit court did not err in its finding that White Pine failed to establish that it had no duty to indemnify West End Pub for Taylor's bodily injury under the Policy's Assault and Battery Exclusion.

## A. White Pine had the Burden of Establishing that the Exclusion Applies.

Although the insured has the burden of establishing that a claim falls within the scope of coverage, the insured may meet that burden by showing proof of a valid settlement agreement. *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 493-94 (2013). Typically, if the insured establishes that an injury is within the scope of coverage, the burden shifts to the insurer to establish that an exclusion removes the insurer's duty to indemnify. *See, e.g.*, *Mut. Fire Ins. Co. of Calvert County v. Ackerman*, 162 Md. App. 1, 7–8 (2005) (affirming a circuit court's decision to place the burden on the insurer to establish whether a house was being used as a "dwelling" at the time of a fire, because the relevant clause in the policy that the insurer argued relieved it of liability constituted an

---

[3] During oral argument before the circuit court, counsel for White Pine argued that a gunshot injury is excluded pursuant to the Policy's definition of "battery," even if the discharge is accidental, because "it's done by a person and it's an act which brings about a harmful and offensive contact." Noting the Policy's use of the language "committed by any person," she offered the distinction between an act "committed" by another person and a "slip and fall" injury -- a covered "accident." The court responded, "Well isn't that the same scenario as the waitress handing me a broken glass? It's an act done by another person accidentally that causes me harm. I put it in my mouth, and I'm cut because she gave me a broken glass." White Pine's counsel tentatively conceded that perhaps that scenario may fall under White Pine's interpretation of the Policy's definition.

12

exclusion from coverage). In other words, where an insurer claims that an exclusion removes the insurer's obligation to indemnify the insured, the insurer bears the burden of showing that the exclusion applies. *See id.*; *Beebe-Lee*, *supra*, 431 Md. at 489.

In the instant case, the circuit court found that Taylor had met his initial burden of proof, that his bodily injury fell within the scope of the commercial liability policy. Taylor entered into evidence the Consent Verdict in which West End admitted to negligence and agreed to a settlement for which West End was liable. Further, Taylor testified at trial and recalled that he had no warning of the shooting and no knowledge of who shot him or even the direction of the bullet. In its defense, White Pine did not present any evidence at all relevant to the cause of the shooting. Instead, White Pine argued that the definition of "battery" under the Assault and Battery Exclusion eliminated White Pine's burden to present evidence regarding the circumstances surrounding the shooting or the shooter's intent. We disagree. As we explain below, the circuit court did not err in finding that White Pine failed to establish that Taylor's bodily injury fell within the scope of the Assault and Battery Exclusion.

**B.** **The Policy's Coverage is Ambiguous with Respect to Unintentional or "Accidental" Acts that Fall Within the Assault and Battery Exclusion's Definition of "Battery."**

In interpreting the provisions of an insurance policy, we rely on the same principles that we apply to traditional contracts. *Bailer v. Erie Ins. Exch.*, 344 Md. 515, 521 (2000) (citing *Bond v. Pennsylvania Nat'l Mut. Casualty Ins. Co.,* 289 Md. 379, 384 (1981)). We explained in *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.* that the trial court's foremost goal in its interpretation of a contract

13

is to ascertain and effectuate the intention of the contracting parties, unless that intention is at odds with an established principle of law. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md. App. 217, 290-91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). "The primary source for determining the intention of the parties is the language of the contract itself." *Id.* at 291, 674 A.2d 106. Therefore, "[i]n construing insurance contracts in Maryland we give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the instrument as a whole." *Finci v. American Cas. Co.,* 323 Md. 358, 369-70, 593 A.2d 1069 (1991). Moreover, "[a] contract must be construed as a whole, and effect given to every clause and phrase, so as not to omit an important part of the agreement." *Baltimore Gas & Elec.,* 113 Md. App. at 554, 688 A.2d 496; *see Bausch & Lomb,* 330 Md. at 779, 625 A.2d 1021.

129 Md. App. 455, 467–68 (1999).

As with any other contract, the court examines "the contract language employed by the parties to determine the scope and limitations of the insurance coverage . . . ." *Pennslyvania Nat. Mut. Ins. v. Roberts*, 668 F.3d 106, 112 (4th Cir. 2012) (quoting *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298 (2000)). In determining the effect of the contract's language, Maryland courts are guided by the objective theory of contracts, which requires the court to

determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.

14

*Spacesaver*, *supra*, 440 Md. at 8 (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985)).

"If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous." *State Farm Mut. Auto. Ins. Co. v. DeHaan*, 393 Md. 163, 193 (2006) (quoting *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508-09 (1995)). To determine "whether language is susceptible of more than one meaning includes a consideration of 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution.'" *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 418 (2014) (quoting *Calomiris v. Woods*, 353 Md. 425, 436 (1999)). The court's analysis should "accord words their ordinary and accepted meanings. The test is what meaning a reasonably prudent layperson would attach to the term." *JMP Associates, Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635 (1997) (quoting *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)).

Maryland does not follow the rule of many other states that insurance policies are generally construed against the insurance company. Nevertheless, "any ambiguity will be 'construed liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015) (quoting *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556–57 (2001)); *accord Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97-98 (1997). As the Court of Appeals noted in *Megonnell v. United Servs. Auto. Ass'n.*, we interpret exclusionary provisions within insurance contracts narrowly. 368 Md. 633, 656 (2002) (quoting Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance, 2d* 276-81 (Eric Mills

15

Holmes ed., vol. 2 § 7.2, West 1996)). "[S]ince exclusions are designed to limit or avoid liability," limitations on coverage must be construed strictly and narrowly and "in favor of a finding of coverage." *Id.* The insurer, therefore, as the drafter of the agreement, must draft the language of an exclusion "conspicuously, plainly and clearly" and "clearly set forth" any limitation on coverage to the insured. *Id.* Moreover, "[a]n exclusion by implication is legally insufficient." *Id.*

"Maryland courts first ascertain the intent of the parties from the policy as a whole, considering extrinsic and parol evidence to construe any ambiguity." *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 483 (2015). If no relevant extrinsic evidence is introduced, however, "or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument." *James G. Davis Const. Corp. v. Erie Ins. Exchange*, 226 Md. App. 25, 35 (2015) (quoting *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 767 (1989)).

In this case, the Policy's Assault and Battery Exclusion provides that the insurance "does not apply to" "bodily injury" or "property damage" "arising out of or resulting from" an "Assault," "Battery," or an "Assault and Battery" that is "committed by any person." "Battery" is defined as "an act which brings about harmful or offensive contact to another or anything connected to another." The Assault and Battery Exclusion in the extant commercial general liability policy does not contain any state of mind requirement or leave battery to be defined by common law definitions, nor does it contain a statement of exclusion for unintentional contacts.

16

White Pine asks us to hold as a matter of law that, to be entitled to a declaratory judgment, the absence of an intent requirement in the Policy's definition of "battery" permitted White Pine to establish nothing more than the mere fact that Taylor was injured as a result of a shooting.[4] A shooting, White Pine argues, is "an act which brings about harmful or offensive contact" regardless of the shooter's intent. Our task in interpreting the Policy's exclusion, therefore, is to decide whether the Policy's definition of "battery" eliminates White Pine's duty of indemnification for all "bodily injuries" or "property damage" that "aris[e] out of or result[] from" "an act which brings about harmful or offensive contact to another," whether or not the act was "accidental."

Interpreting the definition of "battery" in the context of the remainder of the Assault and Battery Exclusion and the purpose of the Policy as a whole, however, provides an alternative, reasonable interpretation of the scope of the exclusion. First, the Assault and Battery Exclusion provides that "assaults," "batteries," or acts combining the two that are excluded under the Policy are acts that are "*committed* by any person." Although the Policy does not define the term "commit," the plain meaning of the term commonly refers to intentional acts, such as the commission of a crime. *See Merriam–Webster's Collegiate Dictionary* (11th ed. 2011) (defining "commit" as "to carry into action deliberately: perpetrate," e.g. to *perpetrate* a crime); *Black's Law Dictionary* (10th ed. 2014) (defining "commit" as "to perpetrate (a crime)"). In the context of excluding injuries arising from

---

[4] White Pine put forth this argument before the circuit court, arguing that "[t]he only thing that needs to be shown is if it's a harmful contact. That's how this policy defines it. There was a harmful contact and, unfortunately, there is no coverage."

17

an "Assault," "Battery," or "Assault and Battery" -- legal concepts that generally refer only to intentional torts -- the term "commit" reinforces the interpretation that the exclusion is arguably limited to intentional acts.

Secondly, as the Court of Appeals has explained, "[i]t is universally understood that some form of intent is required for battery." *Nelson v. Carroll*, 355 Md. 593, 601 (1999). Indeed, the U.S. Supreme Court has recognized that "[i]ntentional torts, as distinguished from negligent or reckless torts," "generally require that the actor intend 'the consequences of an act.'" *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998) (citing RESTATEMENT (SECOND) OF TORTS § 8A, cmt. a (1964)). Clearly, the element of intent, or the state of mind of the actor, is at the very core of what sets apart negligent acts from intentional torts; perhaps two of the most quintessential of intentional torts at common law are the torts of assault and battery. *See* Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort*, 19 HOFSTRA L. REV. 447, 450 (1990). To use the language of intentional tort law to encompass accidental acts without explicitly and conspicuously stating such a scope provides a lack of clarity that the law demands from insurers as the drafters of coverage exclusions. *See Megonnell*, *supra*, 368 Md. at 656.

Finally, the Policy's definition of a "battery" as a "harmful or offensive contact" tracks the language of battery at common law, but the definition is silent as to whether a particular state of mind is required. Assuming *arguendo* that this definition can include both intentional and unintentional acts as White Pine asserts, this definition of battery provides no way to distinguish between an act that results in a "battery" and an "accidental" or negligent act if any cause of bodily injury is set in motion by any person other than the

18

one who is injured. If such a limited scope of coverage under the Policy was intended, White Pine, as the drafter of the Policy could have identified such limitations explicitly in the language of the exclusion.[5] Leaving the definition of battery silent on the issue of intentionality, however, is misleading as to the scope of the exclusion. *See JMP Associates, Inc.*, 345 Md. at 635 (explaining that the test of a provision's meaning "is what meaning a reasonably prudent layperson would attach to the term").

Although an insurer has a right to determine what "occurrences" it will cover or exclude as the drafter of the Policy, when an exclusion lends itself to more than one reasonable interpretation, the exclusion will be construed narrowly against the insurer. *See Blackstone Int'l Ltd.*, *supra*, 442 Md. at 695. The insured has a right to know the extent to which exclusions from coverage will apply when entering into a contract for insurance, and the position that White Pine advocates provides no clear path to defining the limits under the Policy. Due to the ambiguous nature of the Policy's coverage and limitations, we construe the scope of the Policy's Assault and Battery Exclusion against White Pine as the drafter of the Policy. *See id*. We, therefore, interpret the scope of the Assault and Battery Exclusion narrowly to bar coverage for bodily injuries that arise out of a "battery."

---

[5] For example, similar assault and battery exclusions involved in cases from other jurisdictions have excluded "harmful or offensive contact between two or more persons" adding the language, "regardless of degree of culpability or intent." *See, e.g., Miami Beach Entertainment, Inc. v. First Oak Brook Corp.*, 682 So.2d 161, 162 (Fla. 1996). We note, however, that even when the policy's language explicitly and conspicuously includes both intentional and unintentional conduct, some courts have found that "remov[ing] 'culpability or intent' from the definition of battery simply renders the term meaningless" and "creates an exclusion that swallows up the coverage the [p]olicy purports to provide for claims arising from 'bodily injuries.'" *Canopius U.S. Ins., Inc. v. Middleton*, 202 F. Supp. 3d 540, 549-50 (D. S.C. 2016).

**C. The Circuit Court Did Not Err In Its Determination that White Pine Failed to Establish that Taylor's Injury Arose Out of a Battery.**

As White Pine concedes, if the definition of "battery" under the Policy is ambiguous, "the means to resolve that ambiguity would be to resort to the ordinary definition of battery and its interpretations in other cases." White Pine argues that the Policy's "definition of a battery matches the definition in both criminal and civil common law." Further, White Pine asserts, "by every definition and understanding, shooting someone is a battery." Although inconsistent with White Pine's assertion that a shooter's intent is immaterial to the elements of battery, White Pine refers to definitions of battery as it is defined under Maryland law:

> In criminal law, a battery results from "proof that the perpetrator intended to cause harmful or offensive contact against a person without that person's consent and without legal justification." *Hickman v. State*, 193 Md. App. 238, 257 . . . (2010). The necessary intent can be found in the concept of transferred intent, which "applies to 'bad aim cases,' where a defendant shoots at X, misses, and hits Y instead." *Jones v. State*, 213 Md. App. 208, 214 (2013)).

(Emphasis omitted). "In civil law," White Pine notes, a battery occurs "when one intends a harmful or offensive contact with another without that person's consent." (Citations omitted). In its attempt to compare the Policy's definition of battery with common law definitions, however, White Pine fails to note that both of the civil and criminal law definitions to which it refers include intent as a necessary element of battery.

In Maryland, the intentional tort of battery is defined as

> the intentional touching of a person without that person's consent. Touching includes the intentional putting into motion of anything that touches another person, or that touches

20

something that is connected with, or in contact with, another person.

Maryland Pattern Jury Instructions ("MPJI–Cv") § 15:2 (5th ed. 2017). Moreover, "innocent conduct that accidentally or inadvertently results in a harmful or offensive touching is not a battery." MPJI-Cv § 15:2, cmt. A(1). The Court of Appeals in *Nelson* clarified the nuances of the intent requirement for the intentional tort of battery:

> A battery occurs when one intends a harmful or offensive contact with another without that person's consent. *See* RESTATEMENT (SECOND) OF TORTS § 13 & cmt. d (1965). "The act in question must be some positive or affirmative action on the part of the defendant." *Saba v. Darling*, 320 Md. 45, 49, 575 A.2d 1240, 1242 (1990). *See also* PROSSER & KEETON, THE LAW OF TORTS § 9, at 39 (5th ed. 1984). A battery may occur through a defendant's direct or indirect contact with the plaintiff. In this case, [the defendant] unquestionably committed a battery when he struck [the plaintiff] on the side of his head with his handgun. *See Saba*, 320 Md. at 49, 575 A.2d at 1242 (observing that defendant's striking of plaintiff in the face, causing injury to his jaw, was "the *sine qua non* of an intentional tort"). Likewise, an indirect contact, such as occurs when a bullet strikes a victim, may constitute a battery. "[I]t is enough that the defendant sets a force in motion which ultimately produces the result . . . ." PROSSER & KEETON, THE LAW OF TORTS § 9 at 40 (5th ed. 1984).

*Nelson*, 355 Md. at 600–01 (1999).

In Maryland, the crime of "battery" falls under the umbrella term of "assault."[6] Nevertheless, it retains its common law elements under the statutory offenses of first and

___

[6] In Maryland, the crime of "battery" and its common law elements have been consolidated into Maryland's "assault" statutes. *See* Md. Code (2002, Repl. Vol. 2012, Supp. 2016), § 3-201(b) of the Criminal Article ("C.A.") ("'Assault' means the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings."); *see also Robinson v. State*, 353 Md. 683, 697-701 (1999) (describing the effect of the adoption of Maryland's assault statutes).

21

second degree assault. *See* Md. Code § 3-201(b). "First Degree Assault" provides that "[a] person may not intentionally cause or attempt to cause serious physical injury to another." C.A. § 3-202(a)(1). "Second degree assault" prohibits "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." C.A. § 3-201. "It is [] clear that the presence of a specific intent or criminal negligence is a necessary component of the crime of battery and it is the State's burden to prove one or the other of these elements." *Pryor v. State*, 195 Md. App. 311, 335 (2010) (quoting *Elias v. State*, 339 Md. 169, 184–85 (1995)) (alterations in original). The test for criminal negligence "is whether the . . . misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe." *State v. Albrecht*, 336 Md. 475, 501 (1994) (quoting *Minor v. State*, 326 Md. 436, 443 (1992)). Put simply, the defendant's state of mind is an important element of proving the offense of second degree assault in Maryland. An "innocent" accident, therefore, is not sufficient to prove criminal culpability.

White Pine contends that a shooting is a "battery per se," regardless of intent. In support of its argument, White Pine points to the United States District Court's analysis in *Northfield Ins. Co. v. Boxley*, 215 F. Supp. 2d 656 (D. Md. 2002). In *Boxley*, the court relied on Maryland law to determine that an injury arose out of a "battery." White Pine argues that *Boxley* is "virtually identical" to the instant case. The court in *Boxley*, however, relied on evidence of the circumstances leading to the shooting relevant to the shooter's intent to commit an assault, and the court's analysis underscores the significance of the absence of this evidence in the present case regarding Taylor's injury.

22

> Boxley fails to address [the argument that the shooter had the requisite intent to commit an assault] and would be hard-pressed to do so. In this case, as in *Nelson,* the perpetrator was carrying a loaded gun, which he brandished and then discharged numerous times. All of this occurred in connection with a loud argument with Davis. *If the shooter did not intend to harm Davis, the only other reasonable conclusion* which can be drawn from this set of tragic circumstances *is that the perpetrator intended to cause Davis an imminent apprehension of such harm.* Indeed, Boxley recognizes that there is simply no other plausible explanation, as he does not proffer any other theory, stating only that the shooter intended not to shoot Davis "but to warn him."

*Id.* at 663 (emphasis added).

More specifically, the element of the shooter's intent to commit an assault was a prominent focus of the District Court's analysis:

> Indeed, whether the shooter even intended to hit Davis is of no legal consequence. As explained in *Nelson*, the Court of Appeals of Maryland has reiterated the rule that if one commits an assault, and in the course of committing the assault that person comes into contact with the person assaulted, *the intent element of battery may be supplied by the intent element of the assault. Nelson*, 735 A.2d at 1102. Accordingly,
>
> > one who *intends to frighten* another by assaulting him or her, and touches this person in a harmful or offensive manner and claims the touching was inadvertent or accidental, is liable for battery, notwithstanding the contention that the actual touching was never intended. *Id.*

*Boxley*, 215 F. Supp. 2d at 662–63 (emphasis added).

As the District Court observed, to determine "intent" in a civil battery case involving a shooting, the focus is not on whether the shooter intended to shoot the victim, but rather, whether the shooter intended to "set[] a force in motion which ultimately produces the

23

result." *Id.* at 601 (citing *Nelson*, 355 Md. at 602).[7] "Consequently," the court added, "a purely accidental touching is not sufficient to establish the intent requirement for battery." *Id.*

In *Boxley*, the shooter's intent to commit an assault was determinative of the applicability of the Assault and Battery Exclusion. Rather than support White Pine's contention that evidence of the shooter's intent is immaterial, *Boxley* highlights the importance of the court's analysis of evidence relevant to the shooter's intent. As the trial court observed repeatedly, White Pine presented no evidence to support any inference that any person intended to fire the gun that resulted in Taylor's injury. White Pine presented no evidence that Taylor argued with the shooter before the shooting, that the shooter intended to harm some other person such as in a "bad aim" or "transferred intent" case, or even that the shooter had the requisite intent to commit an assault. Indeed, White Pine presented no evidence at all regarding the circumstances leading to the shooting, despite its burden to prove that the exclusion applied. *See Beebe-Lee*, *supra*, 431 Md. at 493.

White Pine argues further that evidence that "Taylor did not see a gun, did not see the assailant, and had no warning of the impending shooting" . . . "support[s] solely the conclusion that the shooting was unwelcome, offensive, and without consent -- a battery of Taylor." Whether Taylor consented to the shooting is not at issue in this case, as the

_____

    [7]    Further, in its application of Maryland law to the facts in *Boxley*, the District Court reiterated the statement by the Court in *Nelson*: "[I]t is universally accepted that some form of intent is required for battery . . . . " 215 F. Supp. 2d at 662 (citing *Nelson*, *supra*, 355 Md. at 601).

24

trial court could reasonably infer that Taylor did not consent to being shot accidentally or unintentionally and still find that a battery had not occurred.

White Pine adds that, had the shooter been caught, that person would have been successfully prosecuted "regardless of whether the shooter intended to hit Taylor or simply had 'bad aim.'" To the extent that White Pine argues that intent is irrelevant to proving the battery version of criminal assault in Maryland, we disagree. White Pine assumes, without putting forward any evidence in the court below, that the shooter intended to hit some person, whether or not that person was Taylor. The trial court, however, had no evidence from which it could infer the shooter's intent such that a theory of "transferred intent" or "bad aim" could apply.

We do not agree with White Pine, therefore, that the intent of the shooter is immaterial for determining whether the act leading to the injury constitutes a battery under either civil or criminal law definitions of a battery. In our view, a shooter's intent is relevant under either a civil or criminal definition of battery. The primary question we must answer in this case is not whether a "battery" occurred, but whether the circuit court erred by finding that White Pine failed to establish that Taylor's injuries arose out of a battery thereby excluding indemnity coverage under the Policy. The focus of our review, therefore, is concentrated on whether White Pine was required to establish more than the mere fact that Taylor was shot in order to establish that his injury arose out of a battery.

Clearly, a shooting in many cases would constitute a "battery" under the common law tort and criminal definitions. Nevertheless, White Pine had the burden of establishing that the exclusion from coverage applied to the facts of this particular case. *See Beebe-Lee*,

25

*supra*, 431 Md. at 493. Without sufficient evidence that the exclusion applied, the trial court did not err in failing to issue a declaratory judgment in favor of White Pine, the effect of which would have been to find as a matter of law that a battery had occurred.[8] We hold, therefore, that the circuit court did not err in finding that White Pine failed to establish that the Policy's Assault and Battery Exclusion applied to remove White Pine's obligation to indemnify West End Pub for its liability to Taylor.

**III.**    **The Circuit Court Did Not Err by Denying White Pine's Request for an Order Finding that the Consent Verdict Between Taylor and West End Pub was Unreasonable.**

White Pine further argues that the circuit court erred when it refused to find that the Consent Verdict between Taylor and West End Pub was unreasonable regarding West End Pub's admission of liability for negligence and the amount of the judgment. At the heart of White Pine's argument that the circuit court should have found the Consent Verdict unreasonable is White Pine's assertion that "Taylor did not offer any evidence of the reasonableness of the admission of liability and judgment and so failed in his . . . burden of proof." Even by the evidentiary framework offered by White Pine, however, White Pine had "the burden of producing sufficient evidence to legitimately create an issue" as the party challenging the settlement. *Port E. Transfer, Inc. v. Liberty Mut. Ins. Co.,* 330 Md.

---

[8]    In *7416 Baltimore Ave. Corp.*, we reversed a trial court's decision to grant summary judgment in favor of an insurer based on the trial court's finding that the policy's assault and battery exclusion removed the insurer's obligation to provide a defense. 83 Md. App. at 698-99 ("By granting summary judgment that the appellee insurer owed no duty to provide the appellant a defense due to the assault and battery exclusion, the court necessarily concluded, as a matter of law, that an assault and battery took place.").

376, 387 (1993). In other words, White Pine, at a minimum, was required to create an issue properly before the court before Taylor, as a proxy for the insured, was required to refute any evidence of unreasonableness. *See id.* (outlining a parallel burden of proof framework where the insurer, rather than the insured, negotiated the settlement at issue and the insured challenged the reasonableness of the settlement). The circuit court did not find, however, that White Pine produced sufficient evidence to support its argument that the Consent Verdict was unreasonable under Maryland law.

White Pine argued the following before the trial court:

> I have a long litany of cases that address the fact that an [un]forseen shooting is something that would not bind . . . the establishment . . . . Mr. Taylor's testimony confirmed that there were no fights that night. He had never heard of any prior shootings. So we would submit that that admission of liability is unreasonable.

Although White Pine points to several cases in which a landlord or premises owner was found to have no duty to protect tenants or invitees against crimes committed by third parties, the only evidence presented by White Pine relevant to West End Pub's defenses to liability was Taylor's own lack of personal knowledge of prior shootings at West End Pub. To the extent that White Pine argues that it was unreasonable for West End to agree to a settlement because West End could have successfully defended Taylor's claims, Taylor's lack of knowledge provides no support that West End had no prior knowledge of dangerous conditions on its premises such that the settlement was unreasonable. White Pine presented no testimony regarding West End's knowledge or lack of knowledge of dangerous conditions or the history of dangerous conditions on the premises. The only other evidence

27

put forth by White Pine was the testimony of an agent of White Pine's parent company who recounted only that White Pine denied West End's requests for a defense and Taylor's demands for indemnity as the assignee of West End's rights under the Policy. Additionally, the witness recalled that White Pine conducted a "brief investigation . . . just to perform our due diligence."

To be sure, an insurer has a right to challenge the reasonableness of a settlement for which it may be held liable, even when it declines to provide a defense or to the insured. *U.S. Fidelity & Guarantee Co. v. Nat'l Paving & Contracting Co.*, 228 Md. 40, 48 (1962). The insured, however, whose insurer has refused to provide a defense and is left to litigate the complaint on his or her own is entitled to "make a reasonable compromise of the suit without losing his right to recover from the insurer under the policy." *Id.* at 48. Under these circumstances, a provision in the policy requiring the insurer's consent or participation in a settlement to be bound by the settlement is effectively waived. *Id.*

The circuit court was presented with the medical bills, lost wages, and other damages claimed by Taylor. In addition, the circuit court had before it West End Pub's admission of wrongdoing in the Consent Verdict. White Pine was not able to produce evidence during the trial that was sufficient to create an issue properly before the trier of fact on the issue of the unreasonableness of the Consent Verdict. Without sufficient evidence, the circuit court properly denied White Pine's request for a declaration that the Consent Verdict and the amount of the settlement was unreasonable.

**IV. The Circuit Court Erred in Awarding Judgment in Excess of the Amount Sought by Taylor in the *Ad Damnum* Clause of the Complaint.**

Finally, White Pine argues that the circuit court erred by awarding an amount above the *ad damnum* clause of the complaint. Maryland Rule 2-305 requires that "[a] pleading that sets forth a claim for relief, . . . shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for relief sought. Unless otherwise required by law, a demand for a money judgment shall include the amount sought." In addition, Md. Rule 2-341(b) provides in relevant part that "[a] party may file an amendment to a pleading after the dates set forth in section (a) of this Rule only with leave of court." The Committee note to Rule 2-341 provides that "[t]he court may grant leave to amend the amount sought in a demand for a money judgment after a jury verdict is returned."

In this case, the circuit court heard the case without a jury and the court awarded damages in excess of the *ad damnum* clause. We treat the circuit court's award of damages as the entry of judgment pursuant to a jury award. Although Taylor's complaint stated a claim for damages in the amount of $74,999.99, the circuit court awarded judgment in the amount of $100,000.00 -- the full amount of the Consent Verdict between Taylor and West End Pub and the maximum amount of coverage under the Policy. Taylor did not file a proper motion to amend the *ad damnum* clause even after the court returned its verdict in excess of the amount requested.

Much of our case law in this area addresses whether a circuit court may grant leave to amend the *ad damnum* clause of the complaint, particularly where a jury has already returned a verdict awarding damages in excess of the *ad damnum* clause. In *Bijou v.*

29

*Young-Battle*, 185 Md. App. 268 (2009), we reviewed in depth the various rule changes and implications regarding the trial court's discretion to grant leave to amend an *ad damnum* clause. To be sure, the circuit court's judgment cannot be reversed on the sole basis that the court awarded an amount above what was requested in the *ad damnum* clause. Md. Rule 8-604(c)(2) ("A judgment will not be reversed because it is for a larger amount than claimed in the complaint if the plaintiff files in the appellate court a release of the excess."). In *Bijou*, however, we held that "as a general rule, a circuit court, in the absence of an amendment to the *ad damnum*, commits error by not reducing the judgment to the amount of the *ad damnum*. . . ." 185 Md. App. at 290-91. Further, we explained that the Court of Appeals in amending the Rules "maintained the requirement that the amount of money damages sought be plead and that, to save the verdict on appeal, any excess of the *ad damnum* be released." *Id.* at 289.

Taylor concedes that the circuit court's award of $100,000.00 exceeded the amount originally sought in the *ad damnum* clause, and that he did not seek to amend the amount of the *ad damnum* clause; therefore, Taylor's counsel does not dispute that the amount of the circuit court's award should be lowered to $74,999.99. Accordingly, we vacate the trial court's judgment of $100,000.00 and remand for the entry of a judgment in favor of Taylor against White Pine Insurance Company in the amount of $74,999.99.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED IN PART AND VACATED IN PART. THE JUDGMENT ENTERED BELOW IN THE AMOUNT OF $100,000.00 IS HEREBY VACATED, AND THE CASE IS REMANDED TO THE CIRCUIT COURT FOR ENTRY OF JUDGMENT IN FAVOR OF HOWARD TAYLOR AGAINST WHITE PINE INSURANCE COMPANY IN THE AMOUNT OF $74,999.99. COSTS TO BE PAID 2/3 BY APPELLANT AND 1/3 BY APPELLEE.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 493

September Term, 2016

_____

WHITE PINE INSURANCE COMPANY

v.

HOWARD R. TAYLOR

_____

Woodward, C.J.,
Berger,
Arthur,

JJ.

_____

Concurring Opinion by Arthur, J.

_____

Filed: July 27, 2017

I agree that because White Pine's Assault and Battery Exclusion uses a term that connotes intentionality ("committed"), its policy can fairly be read to imply that the exclusion does not apply in the absence of evidence that the assault or battery in question was the result of an intentional act. At trial, White Pines did not rule out the (remote) possibility that Mr. Taylor was shot by a sleepwalker or that he was wounded after someone carelessly dropped a loaded weapon. For that reason, I agree that the circuit court was not compelled to rule in White Pine's favor at trial. If White Pine put on some admissible evidence to show that someone intended to fire the shot that injured Mr. Taylor, and if Mr. Taylor had persisted in his professed ignorance about how the shooting occurred, I do not see how the court could have failed to rule in White Pine's favor.