*Harleysville Preferred Insurance Company, et al., v. Rams Head Savage Mill LLC, et al.*, No. 2409, September Term, 2016. Opinion by Fader, J.

**INSURANCE – PLEADINGS – DUTY TO DEFEND**

Where plaintiffs in tort suits against insured alleged claims covered by the insurance policy, the insurer had a duty to defend. Even if the tort plaintiffs do not allege facts that clearly bring a claim within policy coverage, the insurer must defend if there is a potentiality that the claim could be covered by the policy.

**INSURANCE – POLICY INTEREPRETATION**

Restaurant's commercial general liability policy providing coverage for "personal and advertising injury" arising out of "invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor" unambiguously applied to claims of invasion of privacy caused by an insured's act of surreptitiously surveilling female patrons in the restaurant's single-occupancy restroom.

**INSURANCE – POLICY INTERPRETATION**

A policy provision granting coverage for "the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy" did not require that a claimant alleging an invasion of a right of private occupancy also allege a possessory interest in the property to fall within the coverage grant.

**DECLARATORY JUDGMENT – EXTRINSIC EVIDENCE**

Where a party attempted to contest coverage by using extrinsic evidence to resolve an issue that is to be determined in the underlying litigation, it was appropriate to defer resolution of that issue to the underlying litigation.

**INSURANCE – APPLICATION OF CRIMINAL ACTS EXCLUSION**

Where allegations of an underlying complaint did not allow for the potentiality that an insured engaged in conduct that was not criminal, coverage was barred under the policy's exclusion for conduct arising out of the criminal acts. Because the tort of unreasonable intrusion upon seclusion does not require criminal intent, the exclusion did not render coverage illusory.

Circuit Court for Howard County
Case No. 13-C-15-104273

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2409

September Term, 2016

_____

HARLEYSVILLE PREFERRED
INSURANCE COMPANY, et al.

v.

RAMS HEAD SAVAGE MILL, LLC, et al.

_____

Friedman,
Fader,
Rodowsky, Lawrence F.
     (Senior Judge, Specially Assigned),

JJ.*

_____

Opinion by Fader, J.

_____

Filed:  June 28, 2018

*Judge Timothy E. Meredith did not participate
in the Court's decision to designate this opinion
for publication pursuant to Md. Rule 8-605.1.

Appellants Harleysville Preferred Insurance Company and Nationwide Mutual Insurance Company (collectively, "Harleysville") ask us to decide that they had no obligation to provide a defense for two lawsuits filed against their insured, Rams Head at Savage Mill, LLC ("Rams Head"), and Rams Head's general manager and majority owner, Kyle Muehlhauser. The underlying lawsuits sought damages arising from Mr. Muehlhauser's surreptitious videotaping of women who were using a restroom at a restaurant and tavern owned by Rams Head.

We conclude that Harleysville had a duty to defend Rams Head. Harleysville issued insurance policies that provide coverage for damages Rams Head becomes legally obligated to pay because of, among other offenses, the "invasion of the right of private occupancy of a room . . . that a person occupies, committed by or on behalf of its owner . . . ." Under the plain language of the coverage grant, we conclude that the underlying tort suits alleged that Rams Head and Mr. Muehlhauser invaded the plaintiffs' right of private occupancy of the restroom when Mr. Muehlhauser conducted his unauthorized video surveillance. We also conclude that an exclusion for "Recording and Distribution of Material or Information in Violation of Law" does not preclude coverage.

Harleysville did not, however, have a duty to defend Mr. Muehlhauser because coverage for him is excluded by the policies' Criminal Acts exclusion. There is no version of facts alleged in the complaints under which Mr. Muehlhauser's alleged conduct is not criminal. We therefore affirm in part and reverse in part.

**BACKGROUND**

Rams Head is a Maryland limited liability company that owns and operates the Rams Head Tavern. Rams Head's operating agreement designates Mr. Muehlhauser as general manager and majority owner of the company and gives him "full, exclusive, and complete discretion, power, and authority . . . to manage, control, administer, and operate the business and affairs" of Rams Head.

Rams Head leases the property on which it operates the Rams Head Tavern from Savage Mill Limited Partnership under a long-term lease that was originally entered in 1998. During the term of that lease, provided Rams Head pays its rent and abides by the other terms of the lease, Rams Head "shall peaceably and quietly hold and enjoy the Leased Premises . . . without hindrance or interruption by Landlord or any other person or persons . . . ." Rams Head is permitted to make improvements, and is responsible for making repairs, renovations, and renewals to the leased property, subject to approval by Savage Mill. Savage Mill is permitted to make changes to the leased property only with the approval of Rams Head. The circuit court found that Rams Head exercised "exclusive control" over the restaurant.

*The Underlying Incident*

In May 2014, a Rams Head Tavern patron was using its single-occupancy women's restroom when a portable camera fell onto the floor from underneath the sink, close to the toilet. She reported the incident to the police, who identified Mr. Muehlhauser as the culprit. In July 2015, Mr. Muehlhauser pleaded guilty to two counts of conducting video

2

surveillance with prurient intent in violation of § 3-902 of the Criminal Law Article (2012 Repl.; 2017 Supp.).[1]

Two different sets of plaintiffs filed class action complaints in the Circuit Court for Howard County against Rams Head and Mr. Muehlhauser. In *Michelle Castle, et al. v. Kyle C. Muehlhauser, et al.* (Case No. 13-C-15-102598), the plaintiffs alleged that from March 2, 2012 to May 9, 2014, Mr. Muehlhauser mounted a camera in the women's restroom at Rams Head Tavern to "conduct visual surveillance of the female patrons and employees using the toilets . . . solely for prurient intent" in "an attempt to satiate his sexual perversions at the expense of the privacy of the female patrons and employees." The complaint further alleged that Mr. Muehlhauser was "at all times . . . acting in the scope of his employment and/or authority as a principal and employee of" Rams Head and that Rams Head "adopted and ratified" his conduct.

---

[1] Section 3-902(c) of the Criminal Law Article provides, in relevant part:

> A person may not with prurient intent conduct . . . visual surveillance of (1) an individual in a private place without the consent of that individual; or (2) the private area of an individual by use of a camera without the consent of the individual under circumstances in which a reasonable person would believe that the private area of the individual would not be visible to the public, regardless of whether the individual is in a public or private place.

The statute defines "visual surveillance" as "the deliberate, surreptitious observation of an individual by any means[,]" including with "the use of cameras." Crim. Law § 3-902(a)(6). "Private place" includes any "room in which a person can reasonably be expected to fully or partially disrobe and has a reasonable expectation of privacy, in," among other places, a "restaurant or tavern." *Id.* § 3-902(a)(5)(i). "Private place" expressly includes a "restroom." *Id.* § 3-902(a)(5)(ii).

3

The *Castle* complaint brought claims against Rams Head and Mr. Muehlhauser for (1) violation of § 3-902 of the Criminal Law Article, which criminalizes certain visual surveillance with prurient intent and also creates a private cause of action for individuals subjected to unlawful surveillance, and (2) the tort of unreasonable intrusion upon seclusion. The complaint alleged that Ms. Castle and the other putative plaintiffs incurred damages including "expenses, mental pain and suffering, fright, nervousness, indignity, humiliation, embarrassment and insult."

The plaintiffs in *Felicia Barlow Clar, et al. v. Kyle C. Muehlhauser, et al.* (Case No. 13-C-15-102863), similarly alleged that Mr. Muehlhauser, "both individually and in his capacity as President, General Manager, and Owner of the Rams Head . . . did plant video recording equipment in the ladies['] restroom for the purpose of videotaping women patrons and employees in the restroom without their permission." The *Clar* plaintiffs, women who used the restroom at the Rams Head Tavern between January and May of 2014, alleged that "[a]t all relevant times, Defendant Muehlhauser did violate Md. Code Ann., Crim. Law § 3-902 . . . ."

The *Clar* complaint brought seven causes of action: negligent hiring, retention, supervision, selection and qualification (Count I); intrusion upon seclusion (Count II); breach of contract and of the implied duty of good faith and fair dealing (Count III); violation of § 3-902 of the Criminal Law Article (Count IV); negligent violation of § 3-902 of the Criminal Law Article (Count V); negligent entrustment (Count VI); and intentional infliction of emotional distress (Count VII). Counts II, III, IV, V, and VII were brought against Rams Head and Mr. Muehlhauser. Mr. Muehlhauser was not named as a defendant

4

in Counts I and VI. The plaintiffs alleged that, as a result of the conduct of Mr. Muehlhauser and Rams Head, they "suffered severe humiliation, violation, anxiety, loss of dignity, emotional distress, mental anguish, and loss of valuable consideration." In Count VII, they further alleged that they "sustained severe emotional distress resulting in physical manifestations, emotional anguish, fear, anxiety, humiliation, embarrassment and other physical and emotional injuries . . . ."

### *The Harleysville Policies*

During the period covered by the allegations in the complaints—from March 2012 through May 2014 for the *Castle* complaint and from January 2014 through May 2014 for the *Clar* complaint—Harleysville insured Rams Head under three one-year commercial lines insurance policies. For policies running from December 1, 2011 through December 1, 2012 and December 31, 2012 through December 31, 2013, respectively,[2] policy provisions relevant to this dispute were supplied on Harleysville's Commercial General Liability Coverage Form CG 00 01 12 04 (the "04 Policy Form"). From December 31, 2013 through December 31, 2014, relevant policy provisions were supplied on Form CG 00 01 12 07 (the "07 Policy Form"). Rams Head was listed as a named insured under each policy, and each included within the definition of "an insured" the members and managers of the named insureds, but only to the extent of their respective roles. Because the policy provisions were essentially identical each year, with one notable exception identified below, we discuss them collectively.

---

[2] The parties have not explained or raised any issues regarding the apparent gap between the end of the first policy and the beginning of the second.

5

The policies each provided grants of coverage for bodily injury and property damage liability (Coverage A) and personal and advertising liability (Coverage B). Under Coverage A, Harleysville agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Coverage A excludes property damage or bodily injury that is "expected or intended from the standpoint of the insured." In addition to this duty to indemnify, the parties agreed that Harleysville would also have "the right and duty to defend the insured against any 'suit' seeking those damages," but only if such damages would be covered by the policies.

Under Coverage B, Harleysville agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies," including any such injury "caused by an offense arising out of your business" during the policy period. "'Personal and advertising injury' means injury, including consequential 'bodily injury,' arising out of" seven enumerated categories of offenses. Most relevant here is "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." As with Coverage A, in Coverage B Harleysville also undertook "the right and duty to defend the insured against any 'suit' seeking [] damages" for personal and advertising injury covered by the policy.

Harleysville invokes three coverage exclusions contained in the policies. First, only with respect to the policy in place from December 31, 2013 through December 31, 2014

(the "2014 Policy"), the "Recording and Distribution of Material or Information in Violation of Law" exclusion (the "Recording and Distribution exclusion") precludes coverage under both Coverage A and Coverage B for injuries "arising directly or indirectly out of any action or omission that violates or is alleged to violate" three specific statutes— the Telephone Consumer Protection Act ("TCPA"), the CAN-SPAM Act of 2003, and the Fair Credit Reporting Act ("FCRA")—or

> [a]ny federal, state, or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information. [3]

Second, the "Criminal Acts" exclusion exempts from Coverage B injuries "arising out of a criminal act committed by or at the direction of the insured." Third, the "Knowing Violation of Rights of Another" exclusion (the "Knowing Violation exclusion") precludes coverage under Coverage B for injuries "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury'."

---

[3] The 04 Policy Form, which was applicable to the Harleysville policies in place before December 31, 2013, had a narrower version of this exclusion, titled "Distribution of Material in Violation of Statutes." That exclusion, which Harleysville does not contend applies here, precluded coverage for injuries arising from the TCPA, the CAN-SPAM Act of 2003, or "any statute, ordinance or regulation other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information."

### *The Declaratory Judgment Action*

Harleysville sought a declaratory judgment that it did not owe a defense to Rams Head or Mr. Muehlhauser with respect to either underlying action. Harleysville argued that the complaints did not allege injuries covered under either Coverage A or Coverage B and, with respect to the 2014 Policy, that the Recording and Distribution exclusion precluded coverage. Harleysville further argued that Mr. Muehlhauser does not qualify as an insured under the policies because the Criminal Acts and Knowing Violation exclusions preclude coverage for him.

After a hearing, the circuit court issued a memorandum opinion and declaration that Harleysville had a duty to defend Rams Head and Mr. Muehlhauser against both complaints. The court observed that the duty to defend "depends on whether the allegations" in a complaint "potentially come[] within the Policy coverage," regardless of whether the claims have a "probability of success." Thus, the court concluded, Harleysville had an obligation under Coverage A to provide a defense for Rams Head to the *Clar* complaint, which the court concluded "clearly set[] forth numerous 'occurrences'" of negligence by Rams Head that "enabled" Mr. Muehlhauser to conduct surveillance in the restroom, causing "bodily injury" to the plaintiffs.

The court held that both defendants were entitled to a defense under Coverage B, specifically the policy's coverage for injuries arising from an alleged "invasion of the right of private occupancy of a room . . . that a person occupies, committed by or on behalf of its owner." Finding that coverage grant to be ambiguous, the court interpreted it in the light most favorable to the policyholder. The court further rejected Harleysville's reliance

8

on exclusions, concluding that: (1) the Recording and Distribution exclusion is limited to the protection of "personal and financial" information; and (2) the Knowing Violation and Criminal Acts exclusions are invalid under *Bailer v. Erie Ins. Exch.*, 344 Md. 515 (1997), because applying them would render the coverage grant illusory. Because the complaints alleged that Mr. Muehlhauser was, at all relevant times, acting on behalf of Rams Head, the court also concluded that Harleysville owed a duty to defend Mr. Muehlhauser. In light of the pendency of the underlying cases, the court declined to accept extrinsic evidence to resolve whether Mr. Muehlhauser was actually acting on behalf of Rams Head.

Both underlying complaints have now been resolved finally in favor of Rams Head and Mr. Muehlhauser.[4] As a result, the sole remaining coverage issue is whether Harleysville had a duty to defend.

## DISCUSSION

"When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous . . . ." Maryland Rule 8-131(c). "To the extent this case involves questions of law, including the interpretation of a contract, we review for legal error." *White Pine Ins. Co. v. Taylor*, 233 Md. App. 479, 493 (2017); *see Clickner*

---

[4] As we explained in our unreported opinion affirming the entry of summary judgment for Rams Head and Mr. Muehlhauser in *Clar*, none of the named plaintiffs could demonstrate either that they had used the restroom at the Rams Head Tavern on the only day on which there was evidence that Mr. Muehlhauser had placed a video camera there or that Mr. Muehlhauser had videotaped them at any other time. *Clar v. Muehlhauser*, No. 851, Sept. Term 2016, 2017 WL 2962816, *5 (July 12, 2017).

*v. Magothy River Ass'n*, 424 Md. 253, 266-67 (2012) ("Where a case involves both issues of fact and questions of law, this Court will apply the appropriate standard to each issue.").

Whether an insurer has a duty to defend "is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407 (1975). We employ a two-part test to make this determination. First, we determine the "coverage[s] and . . . the defenses under the terms and requirements of the insurance policy." *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981). Second, we review the allegations of the underlying suit to determine whether they "potentially bring the tort claim within the policy's coverage." *Id.* "Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a potentiality that the claim could be covered by the policy." *Brohawn*, 276 Md. at 408. The scope of the duty to defend is broad; it applies whenever a tort plaintiff brings an "action that is *potentially covered* by the policy, no matter how attenuated, frivolous, or illogical that allegation may be." *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 643 (1996).

To address the first part of this test, we must construe the relevant language of the policy according to contract principles. *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 694 (2015). "Maryland follows the law of objective contract interpretation." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003). Thus, "[i]n construing insurance contracts in Maryland we give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the instrument as a

10

whole." *Taylor*, 233 Md. App. at 498 (quoting *Finci v. Am. Cas. Co.*, 323 Md. 358, 369-70 (1991)). We must construe a contract "as a whole" and give effect "to every clause and phrase." *Taylor*, 233 Md. App. at 498 (quoting *Phila. Indem. Ins. Co. v. Md. Yacht Club, Inc.*, 129 Md. App. 455, 468 (1999)).

"Although Maryland does not follow the rule that insurance contracts should be construed against the insurer . . . , any ambiguity will be 'construed liberally in favor of the insured and against the insurer a*s drafter of the instrument*.'" *Blackstone Int'l Ltd.*, 442 Md. at 695 (quoting *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556 (2001)). We "ascertain the intent of the parties from the policy as a whole, considering extrinsic and parol evidence to construe any ambiguity." *Connors v. Gov't Emps. Ins. Co.*, 442 Md. 466, 483 (2015). "The court's analysis should 'accord words their ordinary and accepted meanings'" to ascertain "what meaning a reasonably prudent layperson would attach to the term." *Taylor*, 233 Md. App. at 499 (quoting *JMP Assocs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 345 Md. 630, 635 (1997)). "If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous." *State Farm Mut. Auto. Ins. Co. v. DeHaan*, 393 Md. 163, 193 (2006) (quoting *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508 (1995)).

Because "exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage." *Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 656 (2002) (quoting Eric Mills Holmes & Mark S. Rhodes, *2 Holmes's Appleman on Insurance* § 7.2, at 276-81

(Eric Mills Holmes ed., West 1996). Insurers thus must draft exclusionary provisions "conspicuously, plainly and clearly." *Id.*

## I. HARLEYSVILLE HAD A DUTY TO DEFEND AGAINST CLAIMS THAT RAMS HEAD INVADED THE UNDERLYING PLAINTIFFS' RIGHT OF PRIVATE OCCUPANCY OF THE RAMS HEAD TAVERN'S RESTROOM.

### A. The Plain Language of the Coverage Grant

The coverage grant on which Rams Head primarily relies requires Harleysville to provide a defense to claims for damages based on the "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." Rams Head argues that this coverage grant obligates Harleysville to defend it because the *Clar* and *Castle* complaints alleged that (1) the plaintiffs had a right to occupy the private restroom at the Rams Head Tavern, (2) the plaintiffs in fact occupied that room, (3) Mr. Muehlhauser, acting on behalf of Rams Head, invaded that right of private occupancy by his video surveillance, and (4) Rams Head, by virtue of its control over the restroom, was its owner for purposes of this coverage grant.

Harleysville disagrees that the coverage grant applies to these allegations. Relying heavily on the fact that it is paired in the policy with the concepts of "wrongful eviction" and "wrongful entry," Harleysville argues that to have a "right of private occupancy in a room," one must have a possessory interest in the room. Because the plaintiffs lacked any such interest, Harleysville contends that their claims do not fall within the coverage grant. Harleysville also argues that Rams Head was not the "owner" of the restroom because it was merely a lessee of the premises, which were instead owned by non-party Savage Mill.

12

To determine who is correct, we turn to the plain meaning of the relevant policy terms. *JMP Assocs., Inc.*, 345 Md. at 635. We start with the specific policy language under which Rams Head claims an entitlement to coverage, an "invasion of a right of private occupancy in a room." "Occupancy," as commonly understood, is "the action or fact of occupying a place." *New Oxford American Dictionary*, "occupancy," at 1213 (3d ed. 2010); *see also Merriam-Webster's Collegiate Dictionary*, "occupancy," at 858 (11th ed. 2014) ("the fact or condition of holding, possessing, or residing in or on something"). Common meanings of "occupy" similarly include "to take up (a place or extent in space)," "to take or hold possession or control of," and "to reside in as an owner or tenant," all in *Merriam-Webster's Collegiate*, "occupy," at 858; and "reside or have one's place of business in," "fill or take up," or "be situated in or at," all in *New Oxford American*, "occupy," at 1213. Although each of these sets of definitions of "occupy" includes one that references "resid[ing]" in a place, the others reference more generic concepts of taking up space or having temporary possession of a place. Indeed, the use of variants of "occupy" and "occupied" specifically to identify one's temporary possession of a restroom (e.g., on an airplane) are common.

The word "occupancy" appears as part of the phrase "right of private occupancy." The question is thus not just whether a person claims to have been occupying a particular "room, dwelling or premises," but whether that person claimed a "right" to occupy that location in private. We conclude that, in Maryland, a patron of a business using that business's restroom stall for its intended purpose has a right to do so in private. We need look no further than § 3-902 of the Criminal Law Article, the statute under which Mr.

13

Muehlhauser was convicted and on which the underlying plaintiffs relied, to find a statutory embodiment of this right. Section 3-902(a) prohibits a person from conducting nonconsensual visual surveillance of an individual in a private place with prurient intent. The statute defines "private place" to mean "a room in which a person can reasonably be expected to fully or partially disrobe and has a reasonable expectation of privacy," including a "restroom" in, among other places, a "restaurant or tavern." Crim. Law § 3-902(a)(5)(i) and (6). We conclude that the plain meaning of the phrase "right of private occupancy" covers the right of an individual who is occupying a single-occupancy restroom in a restaurant or tavern for its intended purpose to do so in private.

We also have no trouble in concluding that video surveillance of the activities of an individual who is using a restroom stall in a restaurant or tavern for its intended purpose constitutes an "invasion" of that right. That is, again, conclusively established by the criminal penalties and private right of action created by § 3-902 itself. Maryland also recognizes a cause of action for intrusion upon seclusion, which is "the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 163 (1986) (citing *Restatement (Second) of Torts* § 652B (1977)).[5] As with other privacy torts, whether conduct is "highly offensive" is based on a test of reasonableness. *See Beane v. McMullen*, 265 Md. 585, 600-01 (1972) (stating that "rea[s]onableness under the facts presented is the determining factor" for invasion of privacy claims generally).

---

[5] Harleysville argues that privacy torts require publication. Intrusion upon seclusion has no such requirement. *Restatement (Second) of Torts* § 652B (1977).

14

Thus, "we ask whether there has been an 'intrusion into a private place or the invasion of a private seclusion that the plaintiff has thrown about his person or affairs.'" *Furman v. Sheppard*, 130 Md. App. 67, 73 (2000) (quoting *Pemberton*, 66 Md. App. at 163). Video surveillance of a person's activities in a private restroom stall easily meets that standard.

We conclude that the plain meaning of the phrase "invasion of the right of private occupancy of a room, dwelling or premises that a person occupies," if construed on its own: (1) is unambiguous; and (2) encompasses allegations that an insured conducted video surveillance of individuals using a restroom stall on its premises. We now turn to examine whether other language in the policies compels a different conclusion.

## B.    The Plain Language of the Coverage Grant in Context

Because we do not analyze contractual language in isolation, *Taylor*, 233 Md. App. at 498, we must look at the broader context of the coverage grant to determine the scope of coverage, *Moscarillo v. Prof'l Risk Mgmt. Servs. Inc.*, 398 Md. 529, 540 (2007) ("Maryland Courts should examine the character of the [insurance] contract, its purpose, and the facts and circumstances of the parties at the time of the execution.") (quoting *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224-25 (1997). Harleysville correctly points out that the language "invasion of the right of private occupancy of a room" does not appear alone in the policy. In particular, Harleysville highlights that this phrase appears with two others, "wrongful eviction from" and "wrongful entry into," each of which requires the claimant to allege that she or he has a possessory interest in the property at issue. Based on the doctrine of *ejusdem generis*, Harleysville argues that this construction requires that a

15

claimant alleging an invasion of a right of private occupancy must also allege a possessory interest in the property to fall within this coverage grant.

*Ejusdem generis*, meaning "of the same kind or class," is a "canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." *Black's Law Dictionary*, "*ejusdem generis*," at 631 (10th ed. 2014). Maryland courts have applied this doctrine to the construction of statutes when: (1) there is "an enumeration by specific words"; (2) "the members of the enumeration suggest a class"; (3) "the class is not exhausted by the enumeration"; (4) the enumeration is supplemented, and generally followed, by a "general reference"; and (5) the statute does not "clearly manifest[] an intent that the general term be given a broader meaning than the doctrine requires." *Tribbitt v. State*, 403 Md. 638, 657 (2008) (quoting *In re Wallace W.*, 333 Md. 186, 190 (1993)). The doctrine "is based on 'the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things.'" *In re Wallace W.*, 333 Md. at 190 (quoting *State v. One Hundred & Fifty-Eight Gaming Devices*, 304 Md. 404, 429 n.12 (1985)). The legislature is thus saved from having to "spell[] out in advance every contingency in which the statute could apply." *Id.* at 190-91 (quoting *2A Sutherland Statutes & Statutory Const.* § 47.17, at 188 (5th ed. 1992)). "The doctrine is applicable to contracts as well as to statutes, and has been applied to insurance policies." *Neuman v. Travelers Indem. Co.*, 271 Md. 636, 646 (1974).

In *In re Wallace W.*, the Court of Appeals applied the doctrine to a statute proscribing the unauthorized use of "any horse, mare, colt, gelding, mule, ass, sheep, hog,

16

ox or cow, or any carriage, wagon, buggy, cart, boat, craft, vessel, or any other vehicle including motor vehicle as defined in the laws of this State relating to such, or property whatsoever." 333 Md. at 190. The Court held that because the enumerated items fell into only two categories—livestock and "vehicles that travel on land or water"—the phrase "property whatsoever" should be construed as limited to property falling into one of those two categories. *Id.* at 191. Similarly, in *State v. Sinclair*, the Court construed "other thing of value" in the phrase "money, credit, goods, wares, or other thing of value," to be limited to the class of things "having intrinsic value measurable in money." 274 Md. 646, 650, 659 (1975).

By contrast, the Court has declined to apply the doctrine when doing so would not further legislative intent. Thus, in *One Hundred & Fifty-Eight Gaming Devices*, the Court declined to hold that "other object," as used in the phrase "any piece of money, coin, token or other object representative of [or] convertible into money," was limited to "tangible things." 304 Md. at 429 n.12. And in *Tribbitt*, the Court declined to interpret the general term "sexual abuse" as being limited by the specific examples identified in the statute. 403 Md. at 656-58.

In contrast to *In re Wallace W.* and *Sinclair*, it is not at all clear from the structure of the provision at issue here that "invasion of the right of private occupancy" is intended to be limited by the terms "wrongful eviction" and "wrongful entry," as opposed to constituting a broader type of claim with independent significance. The provision itself is one of seven listed categories of offenses that comprise the definition of "personal and advertising injury." The full list is:

17

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right or private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your 'advertisement'; or

g. Infringing upon another's copyright, trade dress or slogan in your 'advertisement'.

Nothing about this list suggests that "invasion of the right of private occupancy" is intended to be limited in scope by the two terms that precede it. Indeed, none of the other categories of offenses follow that structure. To the contrary, categories (a), (b), (f), and (g), simply list specific offenses. And categories (d) and (e) identify broad categories, but without any specific examples.

We also find it notable that "invasion of the right of private occupancy" is not preceded by the word "other," which is a standard grammatical cue that a term is meant to encompass what came before it. *See, e.g.*, *Sinclair*, 274 Md. at 659 (referencing "other thing of value"). Instead, the provision simply lists three items, separated by an "or" that is not paired with "other," which is the standard grammatical cue that an additional listed item is to follow. By contrast, several of the cases from other jurisdictions on which Harleysville relies construed coverage grants that *did* include the cue "other." Thus, in *Groshong v. Mut. of Enumclaw Ins. Co.*, the Oregon Supreme Court interpreted a coverage

18

grant addressing the "wrongful *entry* or *eviction,* or *other* invasion of the right of private occupancy." 985 P.2d 1284, 1289-90 (Or. 1999). And in *Liberty Mut. Ins. Co. v. East Cent. Okla. Elec. Coop.*, the personal injuries included "wrongful entry or eviction or *other invasion of the right of private occupancy*." 97 F.3d 383, 389 (10th Cir. 1996). Indeed, the United States Court of Appeals for the Third Circuit observed that "[a]lmost all of the precedent invoking the Latin maxim involve insurance policies that include the phrase '*other* invasion of the right of private occupancy.'" *New Castle County v. Nat'l Union Fire Ins. Co.*, 243 F.3d 744, 752 (3d Cir. 2001). That linguistic difference is significant.[6]

Harleysville asserts that "courts nationwide" have "uniformly characterized" the "right of private occupancy" in such a coverage provision "as requiring proof of a possessory interest in real property that is the subject of interference by its owner, typically in cases involving the dispossession of a tenant." Harleysville's contention is overstated. First, as just noted, many of those cases were interpreting policy language that differed in an important respect from that here. *Id.* Second, other cases relied on by Harleysville did not need to, and so did not, interpret the language "invasion of a right of private occupancy" because they specifically concerned claims of wrongful eviction. *E.g., STK Enters., Inc. v. Crusader Ins. Co.*, 14 P.3d 638, 642 (Or. App. 2000); *Century Sur. Co. v. Seductions,*

---

[6] We decline to read the language of these other policies into the Harleysville policy. To the extent the language of the Harleysville policies differs from others, the use of different language is presumptively purposeful and meaningful. *See Aragona v. St. Paul Fire & Marine Ins. Co.*, 281 Md. 371, 375 (1977) ("Insurance contracts, like other contracts, must be read as a single document and construed as a whole . . . . [T]he primary purpose in construing insurance contracts is to ascertain and effectuate the intention of the parties."). We reach no conclusion here regarding how we would interpret a different insurance policy that used different language.

19

*LLC*, 609 F. Supp. 2d 1273, 1278-81 (S.D. Fla. 2009); *Westfield Ins. Grp. v. J.P.'s Wharf, Ltd.*, 859 A.2d 74 (Del. 2004); *Zelda, Inc. v. Northland Ins. Co.*, 56 Cal. App. 4th 1252, 1263-66 (1997).

Third, Harleysville's claim of uniformity is simply incorrect. In *New Castle County*, the Third Circuit observed that courts interpreting similar policy language had reached inconsistent conclusions. There, New Castle County was a defendant in suits alleging that it had frustrated development plans by denying a building permit and voiding a recorded plan for the property at issue. 243 F.3d at 747-48. The court surveyed other cases interpreting similar policy provisions, finding that some concluded that the provision requires a possessory interest in real property and others, admittedly smaller in number, did not. *Id.* at 750-54. Observing that insurance companies had stubbornly refused to clarify the policy language in response to these varied interpretations, the court found the language ambiguous and, as a result, held that New Castle County was entitled to coverage. *Id.* at 756. The court rejected the use of *ejusdem generis*, reasoning that applying the doctrine to reach the conclusion that the policy language was unambiguous "would fly in the face of commonsense." *Id.* at 747; *accord Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 653 (D. Md. 2009) (finding the phrase "invasion of the right of private occupancy" ambiguous in light of the many varying interpretations of it, and thus construing it against the insurer under Maryland law); *see Town of Goshen v. Grange Mut. Ins. Co.*, 120 N.H. 915, 917 (1980) (finding that a "tangible interference with [] physical property" was not required to find an invasion of private right of occupancy).

Indeed, in the case that is most directly on point, the United States Court of Appeals for the Fifth Circuit, applying Mississippi law, concluded that nearly identical policy language afforded coverage for a similar claim. *Am. Guarantee & Liab. Ins. Co. v. The 1906 Co.*, 273 F.3d 605 (5th Cir. 2001). There, the underlying allegations were that a "male employee had surreptitiously videotaped female customers changing clothes in a women's dressing room on the insured's premises." *Id.* at 607. The policy provided coverage for personal injury, including "[w]rongful eviction from, wrongful entry into, *or invasion of the right of private occupancy of a room*, dwelling or premises that a person occupies *by or on behalf of its owner, landlord or lessor*." *Id.* at 611 (emphasis supplied by Fifth Circuit). Construing the applicable terms according to their plain and ordinary meanings, the court concluded "that an average purchaser of insurance could reasonably understand" the policy to cover "the invasion of a room that is secluded from the sight, presence, or intrusion of others," and that the video surveillance alleged "falls within this definition." *Id.* at 619. Moreover, although the court found the provision to be unambiguous, it further noted that even if it were ambiguous, it would need to be interpreted in favor of coverage under Mississippi law. *Id.* at 619-20 (acknowledging that "[w]ell reasoned opinions of other courts" had found the phrase to be "highly ambiguous").

We join the Fifth Circuit in declining to read into the phrase "invasion of the right of private occupancy" a requirement that a claimant asserting such a right have a possessory interest in the property at issue. As already noted, we do not consider the doctrine of *ejusdem generis* to be implicated by either the grammatical structure of the provision or the context of the list in which it appears. We do not believe the coverage grant to be

21

ambiguous. But even if it were, in the absence of any extrinsic evidence that would support Harleysville's interpretation, we would be required to interpret the provision in favor of the reasonable interpretation proffered by Rams Head. We thus conclude that, for purposes of the duty to defend under the Harleysville policies, video surveillance of individuals using a restroom in a tavern or restaurant for its intended purpose is an invasion of the right of private occupancy of the restroom.

### C. Rams Head as the Owner of the Restroom

Harleysville also contends that the underlying complaints do not allege "personal and advertising injury" under the policy because they do not allege that the invasion of the right of private occupancy at issue was committed by or on behalf of the "owner, landlord or lessor" of the restroom. The facts are not in dispute. Rams Head leases the property on which the Rams Head Tavern is located from Savage Mill pursuant to a long-term lease. Provided Rams Head complies with its obligations under the lease, it is entitled to "peaceably and quietly hold and enjoy the Leased Premises . . . without hindrance or interruption by Landlord or any other person or persons . . . ." The circuit court found that Rams Head exercises "exclusive control" over the restaurant.

In essence, Harleysville asks that we strictly construe the term "owner" to be limited to the legal ownership of the real property on which the building is located. Rams Head counters that the use of "owner" in the provision is more flexible and encompasses Rams Head's exclusive control over the restroom located in the business it owns and operates.

To resolve this issue, we look to the common and popular understanding of the word "owner." *See generally Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 781

(1993) (observing that courts afford policy terms the meanings "as used and understood by reasonably prudent laypersons in daily life"). Of course, "owner" is not used in a vacuum, but it appears as part of the phrase "of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor." Given that we are focused on a "right of private occupancy" in the restroom, the question is whether Rams Head was the "owner" of that room.

A common definition of "own" is "have (something) as one's own; possess." *New Oxford American*, "own," at 1253; *accord Merriam-Webster's Collegiate*, "own," at 887 ("to have or hold as property: POSSESS"). There is no indication in the policies that "owner" was intended to reference fee simple ownership of real property as opposed to this common, everyday understanding of the term. It is uncontested here that Rams Head possessed the entire Rams Head Tavern, including its women's restroom; indeed, Harleysville's counsel expressly conceded that at oral argument. We conclude that, for purposes of this coverage grant, Rams Head was the "owner" of the restroom in the Rams Head Tavern.

We consider it confirmation of our interpretation of the plain language of the policy that coverage would be rendered illusory if we were to instead accept Harleysville's interpretation. This category of personal and advertising injury insurance provides coverage for claims that an insured who has granted someone a right to possess or occupy privately a "room, dwelling or premises" has wrongfully diminished or destroyed that right. Interpreting "owner, landlord or lessor" as proposed by Harleysville would effectively eliminate coverage for any owner of a business that, like Rams Head, does not own in fee

23

simple the property on which the business operates. In light of the structure of many modern businesses, that would effectively wipe out coverage for many business owners even for wrongful eviction or wrongful entry claims. For example, a hotel that is operated by a company that does not own the underlying property would be denied coverage for a claim that it improperly evicted a patron from a room she or he had rented.

Rams Head, not Savage Mill, possessed and had control over the restroom. And Rams Head, not Savage Mill, was empowered to grant its customers the right to occupy the restroom while they were patronizing the restaurant. We therefore conclude that Rams Head was the owner of the restroom for purposes of the coverage grant. We now turn to the exclusions Harleysville invokes.[7]

## D.        The Recording and Distribution Exclusion

Harleysville contends that even if Rams Head otherwise would be entitled to a defense, coverage is precluded under the 2014 Policy by the Recording and Distribution exclusion.[8] Under that exclusion, coverage is not available for "'personal and advertising injury' arising directly or indirectly out of any action or omission that violates or is alleged to violate" three specific statutes—the Telephone Consumer Protection Act ("TCPA"), the

---

[7] In light of our conclusion that Harleysville owed a duty to defend Rams Head with respect to both underlying complaints under Coverage B of the policies, we do not address Rams Head's contention that Harleysville also had a duty to provide coverage for the *Clar* complaint under Coverage A.

[8] The *Castle* complaint alleged conduct going back to 2012. The *Clar* complaint alleged conduct only in 2014. The Recording and Distribution exclusion applies only to the 2014 Policy. If the Recording and Distribution exclusion were applicable, it would thus preclude coverage entirely for the *Clar* complaint, but Harleysville would still owe a defense for the *Castle* complaint under the policies in effect during 2012 and 2013.

CAN-SPAM Act of 2003,[9] and the Fair Credit Reporting Act ("FCRA")—or "[a]ny federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information."

Unlike the listing of offenses covered as personal and advertising injury, this appears to be a paradigmatic case for application of *ejusdem generis*, as it satisfies all of the *In re Wallace W.* criteria. 333 Md. at 190. Here, we have (1) an enumeration by specific words of statutes intended to be covered; (2) the enumeration suggests a class of statutes directed at protecting consumers from either unwanted solicitations (TCPA and CAN-SPAM) or the collection and distribution of financial information (FCRA); (3) a class that is not exhausted by these references; (4) a reference to a general category; and (5) no manifestation of an intent to give a broader meaning to the general category than the doctrine requires. Thus, we interpret the Recording and Distribution exclusion to cover conduct that is alleged to violate, in addition to the specified statutes, other statutes or regulations that protect consumers from the types of harm addressed by the enumerated statutes: unwanted solicitations and the improper collection and distribution of financial information.

---

[9] This use of "spam" comes from a sketch by the British comedy troupe Monty Python about a group of Vikings singing "a chorus of 'spam, spam, spam . . . '" about the meat product SPAM "in an increasing crescendo, drowning out other conversation." Thus, "the analogy applied because [spam email] was drowning out normal discourse on the Internet." *MaryCLE, LLC v. First Choice Internet, Inc.*, 166 Md. App. 481, 496 n.14 (2006) (internal quotations omitted).

The history of this provision supports our interpretation. The 04 Policy Form contained a "Distribution of Material in Violation of Statutes" exclusion, which was similar to the Recording and Distribution exclusion except that it did not: (1) list the FCRA as a specific statute covered; or (2) include "printing, dissemination, disposal, collecting, [or] recording" in the general category that followed the listing of specific statutes. The addition of the FCRA was thus linked to the addition of these new terms in the general category when the new exclusion appeared by endorsement in the 2014 Policy. The FCRA is intended to promote fair and accurate credit reporting by, among other things, regulating the creation, collection, dissemination, disposal, and reporting of credit information, *see generally* 15 U.S.C. §§ 1681 – 1681x. Especially considering the structure of this exclusion, it is apparent that the additional terms, including "recording," were intended to bring within the scope of the exclusion claims alleging the violation of laws similar to the FCRA. We discern no basis for reading such a provision so broadly as to encompass the type of "recording" at issue here.

II. **HARLEYSVILLE DID NOT HAVE A DUTY TO DEFEND AGAINST CLAIMS THAT MR. MUEHLHAUSER INVADED THE UNDERLYING PLAINTIFFS' RIGHT OF PRIVATE OCCUPANCY OF THE RAMS HEAD TAVERN'S RESTROOM.**

Our analysis with respect to the general applicability of Coverage B and the lack of application of the Recording and Distribution exclusion applies equally to Mr. Muehlhauser's claim for coverage as it does to Rams Head's claim for coverage. However, Harleysville raises additional defenses to Mr. Muehlhauser's claims, including that: (1) Mr. Muehlhauser is not an "insured" under the policy for purposes of the underlying

claims; and (2) the Knowing Violation and Criminal Acts exclusions preclude coverage. We disagree as to the first argument, but agree that the Criminal Acts exclusion applies and bars coverage for Mr. Muehlhauser.

**A.    Mr. Muehlhauser Was an Insured Under the Policy for Purposes of the Duty to Defend.**

The policies define an insured to include the members of a named insured, "but only with respect to the conduct of your business," as well as the managers of a named insured, "but only with respect to their duties as your managers." Harleysville contends that Mr. Muehlhauser was not an insured for purposes of the *Clar* and *Castle* claims because the activities he is alleged to have engaged in were not "with respect to the conduct of [Rams Head's] business." Mr. Muehlhauser responds that, at least for purposes of the duty to defend, he qualifies as an insured because both complaints expressly alleged that he was acting within the scope of his duties as a manager and owner of Rams Head.

Before we address the merits of this claim we must first address Harleysville's contention that the circuit court erred in refusing to consider evidence outside the pleadings that would have established conclusively that Mr. Muehlhauser was not acting with respect to the conduct of Rams Head's business. Harleysville argues that the parties to a declaratory judgment action regarding the duty to defend are not restricted to the allegations of the underlying complaints when considering who is an insured under the policy. Although that is true in certain circumstances, those are limited to cases in which the resolution of the question of who an insured is would not affect the defense of the underlying claims. That is not the case here.

27

As already discussed, the general rule is that whether an insurer has a duty to defend is determined exclusively by comparing the coverage provisions of the policy against the allegations of the claim. *Blackstone Int'l Ltd.*, 442 Md. at 696. Where coverage questions are entirely separate and distinct from the defense of the underlying action, such as the resolution of an ambiguity in policy language, they may be resolved while the underlying action is pending. *Pryseski*, 292 Md. at 194. In such circumstances, the court must resolve the coverage questions "in favor of the insured before it can conclude that the insurer has or had an obligation to provide a tort defense." *Id.* On the other hand, where an insurer contests coverage based on a contention that is to be resolved in the underlying litigation— i.e., where the coverage and underlying liability issues are in some way intertwined—it is inappropriate to resolve that issue in a separate coverage action while the underlying action remains pending.

This rule serves the important purpose of preventing an insurer that is attempting to avoid a coverage obligation from prejudicing the defense of its insured in the underlying action in the process. Thus, as the Court of Appeals observed in *Brohawn*, where an insurance company's claim is that there is no coverage because the insured failed to comply with the requirements of the policy, a preliminary declaratory judgment action to determine coverage issues may be appropriate. 276 Md. at 405. "But where, as here, the question to be resolved in the declaratory judgment action will be decided in pending actions, it is inappropriate to grant a declaratory judgment." *Id.* at 406. In *Brohawn*, because the issue of whether the tort defendant/coverage claimant acted "with intent to cause injury" was

relevant to both the coverage determination and the underlying action, it could not be resolved through the declaratory judgment action. *Id.* at 400, 405-06.

If the circuit court here were to have taken evidence to determine whether Mr. Muehlhauser really had acted within the scope of his duties for Rams Head, as alleged in the underlying complaints, it would have been deciding an issue that still needed to be resolved in the underlying actions. That it was not permitted to do.[10] As the circuit court correctly observed, if that issue had remained unresolved by the underlying litigation, it could have been litigated in a separate, later declaratory judgment action. *See, e.g.*, *Allstate Ins. Co. v. Atwood*, 319 Md. 247, 263 (1990). The court thus did not err in declining to consider matters outside the "eight corners" of the underlying complaints and the policies. *See Montgomery Cty. Bd. of Educ. v. Horace Mann Ins. Co.*, 154 Md. App. 502, 511 (2003), *aff'd*, 383 Md. 527 (2004) (under the "eight corners rule," a court is required "to analyze only the complaint and the insurance policy when determining whether a claim could potentially come within the coverage and, consequently, [to] disregard any extrinsic evidence").

Turning to the merits, we also concur with the circuit court's conclusion that, based on the allegations of the underlying complaints and the policies' definition of an insured, Mr. Muehlhauser was an insured for purposes of the duty to defend. Both sides rely on the

---

[10] The Court of Appeals has recognized a further exception allowing courts to entertain declaratory judgment actions prior to trial of the underlying action "where the allegations in the underlying tort claims 'obviously constitute a patent attempt to recharacterize, as negligent, an act that is clearly intentional . . . .'" *Pettit v. Erie Ins. Exch.*, 349 Md. 777, 780 (1998) (quoting *Allstate Ins. Co. v. Atwood*, 319 Md. 247, 253 (1990)). Harleysville does not contend that this exception applies here.

Court of Appeals's decision in *Pryseski*, which we agree is dispositive. There, a plaintiff filed suit against an insurance broker whose "duties included the collection of monthly premiums" at customers' residences. 292 Md. at 190. The plaintiff alleged in relevant part that "in the course of his employment as an agent," Mr. Pryseski entered her home "for the purpose of collecting" a premium before making sexual advances on her. *Id.* She alleged that this incident occurred "during the course of and while acting in the scope of [Mr. Pryseski's] employment," which his employer then ratified. *Id.* The employer's insurer refused to provide a defense for Mr. Pryseski and initiated a declaratory judgment action to contest coverage on the ground that Mr. Pryseski had not acted within the scope of his employment. *Id.* at 191. The Court of Appeals held that, for the purpose of the declaratory judgment action, the lower courts should have construed the policy language at issue, including the meaning of policy terms, but that it would have been inappropriate to decide in the declaratory judgment action whether Mr. Pryseski was acting in the scope of his employment. *Id.* at 196.

As with Mr. Pryseski, whether Mr. Muehlhauser was actually acting within his scope of employment was a question for the factfinder in the underlying tort actions. *See Sawyer v. Humphries*, 322 Md. 247, 254-61 (1991) (discussing factors to be considered in determining whether an employee's conduct was within the scope of employment). The tort plaintiffs alleged that he was acting within the scope of his employment, and made claims that, if true, had the potentiality to establish Mr. Muehlhauser as an insured. The circuit court thus did not err in treating Mr. Muehlhauser as an insured for purposes of the duty to defend.

30

**B.** **The Criminal Acts Exclusion Bars Coverage for Mr. Muehlhauser.**

We now turn to our one point of departure from the thorough analysis of the circuit court, the applicability of the Criminal Acts exclusion. Coverage B does not apply to injuries "arising out of a criminal act committed by or at the direction of the insured." Harleysville contends that this exclusion bars coverage for Mr. Muehlhauser because the acts he is alleged to have committed are criminal. Mr. Muehlhauser argues that the application of this exclusion would render meaningless the coverage grant and run afoul of the rule established in *Bailer*, which prohibits giving effect to an exclusion that would swallow the coverage grant. 344 Md. at 525. Harleysville disagrees, asserting that, unlike the "expected or intended" exclusion at issue in *Bailer*, giving force to the Criminal Acts exclusion would not negate the coverage provided by Coverage B. We agree with Harleysville.

The starting point for our analysis is *Bailer*. The Bailers' au pair, after learning that Mr. Bailer had secretly videotaped her while she showered, sued for invasion of privacy. *Id.* at 518. The Bailers called upon their personal catastrophe liability policy for a defense. The policy covered "invasion of privacy" as a "[p]ersonal injury," but excluded "personal injury . . . expected or intended by anyone we protect." *Id.* at 520-21. Based on that exclusion, the insurer denied coverage. *Id.* at 521. The Court of Appeals, construing the au pair's claim as one for unreasonable intrusion on seclusion, *id.* at 526, held that the insurer could not rely on the expected or intended exclusion to deny coverage, *id.* at 533-34. That is because an "[i]ntrusion upon seclusion must always be intentional in order to be

31

tortious." *Id.* at 534. As a result, applying the expected or intended exclusion to that claim would render the coverage grant itself illusory. *Id.* at 525. The Court thus refused to give effect to the exclusion. *Id.* at 533-34.

Although a claim for an unreasonable intrusion upon seclusion can, as here, be based on conduct that is criminal, it need not be.[11] Such a claim involves an intentional intrusion, "physical[] or otherwise, upon the solitude or seclusion of another or his private affairs or concerns." *Id.* at 526 (quoting *Restatement (Second) of Torts* § 652B); *see Pemberton*, 66 Md. App. at 163 (defining intrusion upon seclusion without requiring criminal intent); *Furman*, 130 Md. App. at 73 (same). Criminal intent is not required. Thus, nonconsensual video surveillance in a private place without prurient intent may still constitute an unreasonable intrusion upon seclusion while not running afoul of Criminal Law § 3-902. Such a claim would thus trigger Coverage B without being precluded by the Criminal Acts exclusion. As a result, the exclusion does not render coverage illusory and we are not permitted to disregard it. Harleysville "contracted to underwrite" coverage for its insured that excluded coverage for criminal acts; it will "not subsequently be expected to assume

---

[11] The Court in *Bailer* examined the potential conflict between the coverage grant and the exclusion at the level of the particular type of coverage potentially implicated. The policy provided coverage for "personal injury," one component of which was "invasion of privacy." *Id.* at 520. Under Maryland law, invasion of privacy itself encompasses four different claims, one of which is unreasonable intrusion upon seclusion. *Id.* at 525-26. In examining the application of the exclusion, the Court examined only whether it would negate coverage for unreasonable intrusion upon seclusion claims, not all invasion of privacy claims, much less all personal injury claims. *Id.* at 533-34.

32

liability for a risk" that it has "expressly excluded." *Parker v. State Farm Mut. Auto. Ins. Co.*, 263 Md. 206, 216 (1971).[12]

Because the Criminal Acts exclusion cannot be disregarded, it precludes coverage under the policies for the claims against Mr. Muehlhauser. The complaints both allege that Mr. Muehlhauser acted with prurient intent in surreptitiously videotaping women who were using the restroom. Neither complaint includes any alternative factual allegations under which Mr. Muehlhauser's conduct might not be criminal. This is not a case in which the allegations of the complaints allow the possibility that there was tortious-but-not-criminal conduct by Mr. Muehlhauser that would give rise to a potentiality of coverage for him. Harleysville thus did not have a duty to defend Mr. Muehlhauser in connection with the *Castle* and *Clar* complaints.

For the foregoing reasons, we affirm the circuit court's order as to Harleysville's duty to defend Rams Head, but reverse its determination that Harleysville had a duty to defend Mr. Muehlhauser. We remand to the circuit court for entry of a declaratory judgment that is consistent with this opinion.

---

[12] Harleysville's declaratory judgment complaint argued that the Knowing Violation exclusion precluded coverage for both Rams Head and Mr. Muehlhauser. On appeal, Harleysville has limited its argument regarding that exclusion to Mr. Muehlhauser. Because we find coverage for Mr. Muehlhauser precluded by the Criminal Acts exclusion, we need not separately address the Knowing Violation exclusion. If we were to address that exclusion, we would conclude that it does not apply for the same reasons that the "expected or intended" exclusion did not apply in *Bailer*. Although an action that constitutes an unreasonable intrusion upon seclusion need not be criminal, it must, by definition, be intentional. *See Pemberton*, 66 Md. App. at 163 (defining tort as "the intentional intrusion upon the solitude or seclusion of another . . .").

33

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 80% BY APPELLANTS AND 20% BY APPELLEES.**